USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-26-12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
JANKI BAI SAHU, et al.,            :
                                   :
                Plaintiffs,        :
                                   :
     -against-                     :      No. 04 Civ. 8825 (JFK)
                                   :      **Opinion and Order**
UNION CARBIDE CORPORATION          :
and WARREN ANDERSON,               :
                                   :
                Defendants.        :
------------------------------X

APPEARANCES:

     For Plaintiffs:
     Matthew K. Handley
     Maureen E. McOwen
     COHEN, MILSTEIN, SELLERS & TOLL, PLLC

     Richard S. Lewis
     Reena Gambhir
     HAUSFELD, LLP

     Himanshu Rajan Sharma
     LAW OFFICE OF H. RAJAN SHARMA

     Richard L. Herz
     Jonathan G. Kaufman
     EARTH RIGHTS INTERNATIONAL

     Curtis V. Trinko
     LAW OFFICES OF CURTIS V. TRINKO, LLP

     For Defendants:
     William C. Heck
     William A. Krohley
     KELLEY DRYE & WARREN, LLP

**JOHN F. KEENAN, United States District Judge:**

     Before the Court is Union Carbide Corporation ("UCC") and

Warren Anderson's ("Anderson") renewed motion for summary

judgment.  For the reasons that follow, the motion is granted.

1

## I.   Background

### A.   Procedural History

Plaintiffs initially filed suit as members of a putative class in a predecessor action entitled <u>Bano v. Union Carbide Corporation</u>, which was ultimately dismissed on statute of limitations grounds.  <u>See</u> <u>Bano v. Union Carbide Corp.</u>, No. 99 Civ. 11329, 2003 WL 1344884 (S.D.N.Y. Mar. 18, 2003), <u>aff'd in part</u>, 361 F.3d 696 (2d Cir. 2004).  Those Plaintiffs who presented timely claims re-filed the instant suit against UCC (together with its former CEO Warren Anderson, "Defendants"), seeking monetary damages and medical monitoring for injuries allegedly caused by exposure to soil and drinking water polluted by hazardous wastes produced by the Union Carbide India Limited ("UCIL") plant in Bhopal, India (the "Bhopal Plant").  Prior to 1994, UCIL was a partly-owned subsidiary of UCC.  UCC ultimately divested itself of the subsidiary, after which time UCIL changed its name to Eveready Industries India Limited ("EIIL").  Neither UCIL nor EIIL are named as defendants.  Instead, Plaintiffs seek to hold UCC and Anderson liable for their injuries on the grounds that (1) they were direct participants and joint tortfeasors in the activities that resulted in the pollution; (2) they worked in concert with UCIL to cause, exacerbate, or conceal the pollution; and (3) UCIL acted as UCC's alter ego, justifying piercing the corporate veil.

On May 18, 2005, Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and/or for summary judgment pursuant to Rule 56.  The Court converted that portion of the motion styled as a motion to dismiss into a motion for summary judgment on the grounds that matters outside the pleadings had been presented to the Court and that Plaintiffs were on notice that such a conversion was possible.  Sahu v. Union Carbide Corp. (Sahu I), 418 F. Supp. 2d 407, 410-11 (S.D.N.Y. 2005).  The Court then granted summary judgment in favor of Defendants on all claims, except for what has heretofore been referred to as Plaintiffs' veil-piercing claim.  Id. at 416.  With respect to the veil-piercing claim, the Court reserved decision so Plaintiffs could conduct discovery pursuant to Rule 56(d) regarding "EIIL and its corporate relationship to UCIL and UCC."  Id.  After the close of Rule 56(d) discovery, by opinion and order dated November 20, 2006, the Court granted summary judgment in favor of Defendants on the veil-piercing claim.  Sahu v. Union Carbide Corp. (Sahu II), No. 04 Civ. 8825, 2006 WL 3377577 (S.D.N.Y. Nov. 20, 2006).

The Second Circuit addressed in a single opinion both the initial grant of summary judgment on the non-veil-piercing claims and the subsequent grant of summary judgment on the veil-piercing claim.  Sahu v. Union Carbide Corp., 548 F.3d 59 (2d Cir. 2008).  Twice noting that it was a "close case" or "close

3

question," id. at 67, 70, the Second Circuit vacated and remanded both decisions.  The Court of Appeals found that Plaintiffs had not received adequate notice that Defendants' motion to dismiss the non-veil-piercing claims would be converted to one for summary judgment.  Id. at 66-70. Additionally, "because the court's dismissal of the veil-piercing claim relies, in part, on its dismissal of the non-veil-piercing claims," the Court of Appeals vacated both the Sahu I and Sahu II judgments in their entirety.  Id. at 70.  The case was remanded to the district court "for what would appear to be relatively limited further proceedings in connection with consideration of summary judgment."  Id.

Despite the Second Circuit's guidance as to "limited" further proceedings, Plaintiffs embarked on a discovery expedition worthy of Vasco da Gama.  See Sahu v. Union Carbide Corp., 262 F.R.D. 308, 312 (S.D.N.Y. 2009) (granting in part Plaintiffs' "63 requests for the production of documents from Defendants; 18 requests for the production of documents from third party Arthur D. Little, a consulting firm that assisted in the environmental rehabilitation of the Bhopal site; a Rule 30(b)(6) deposition of Defendant UCC; depositions of several of Defendant UCC's former officers; and 86 requests for admission"); Sahu v. Union Carbide Corp., No. 04 Civ. 8825, 2010 WL 909074 (S.D.N.Y. Mar. 15, 2010) (denying cross motions for

reconsideration of September 22, 2009 order granting limited Rule 56(d) discovery); Sahu v. Union Carbide Corp., 746 F. Supp. 2d 609 (S.D.N.Y. 2010) (overruling objections to Magistrate Judge Pitman's July 23, 2010 order denying Plaintiffs' motion to compel production of certain documents); Sahu v. Union Carbide Corp., No. 04 Civ. 8825, 2010 WL 5158645 (S.D.N.Y. Dec. 20, 2010) (denying Plaintiffs' application to stay time for opposition to Defendants' summary judgment motion to conduct still more Rule 56(d) discovery and Rule 30(b)(6) depositions); see also Sahu v. Union Carbide Corp., No. 04 Civ. 8825, 2010 WL 2473585 (S.D.N.Y. June 16, 2010) (denying as premature Plaintiffs' motion for retroactive application of Rule 15(a) of the Federal Rules of Civil Procedure should they decide to file an amended complaint); Sahu v. Union Carbide Corp., No. 04 Civ. 8825, 2010 WL 532307 (S.D.N.Y. Feb. 11, 2010) (denying Plaintiffs' motion to have the case reassigned to another district judge).  More than two years and 12,000 pages of discovery later, Defendants renewed their motion for summary judgment as to all theories of liability.

### B.   Summary Judgment Facts

Although Sahu I and Sahu II were vacated on procedural, as opposed to substantive, grounds, the Court begins its summary judgment analysis anew to account for the entirety of the expanded record.  Accordingly, the Court considers the May 17,

2005 Declaration of William C. Heck ("2005 Heck Decl.") and accompanying exhibits submitted in support of the initial motion to dismiss/motion for summary judgment and the March 1, 2011 Declaration of Matthew K. Handley ("Handley Decl.") and accompanying exhibits submitted in opposition to Defendants' renewed motion for summary judgment, with one exception.  "[I]n determining the appropriateness of a grant of summary judgment, the district court "may rely only on admissible evidence." Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010). Therefore, the Court does not consider the transcript of an unsworn interview of Ranjit Dutta, a former UCIL employee, conducted by Plaintiff's counsel on February 2, 2010 in Mr. Dutta's backyard in Bhopal.  (Handley Decl., Ex. XX).  Beyond the sheer unreliability of unsworn testimony given by a man who stated that he has dementia and cannot "remember his grandson's name, so telling me to recall something from 26 years ago [is] out of the question," (id. at 3:9-12), the interview is inadmissible hearsay.  In further support of its renewed motion, Defendants also submitted the March 31, 2011 Declaration of William C. Heck ("2011 Heck Decl.") and nine accompanying exhibits, which were not part of their initial summary judgment motion.  Plaintiffs object to the Court's consideration of these new exhibits on the grounds that they have had no opportunity to respond.  Although all the documents were previously produced to

Plaintiffs in this action or in Bano, in the interest of fairness, the Court declines to include eight of the nine exhibits in the expanded summary judgment record.  Exhibit 8 to the 2011 Heck Declaration (a 1992 report entitled "Process Package for Disposal of SEP Contents at UCIL, Bhopal") is the same document as Exhibit D49 to the 2005 Heck Declaration, but Exhibit 8 presents the document in its entirety, whereas Exhibit D49 only included excerpts.  As Exhibit 8 was part of the original summary judgment record, it will be considered in conjunction with the renewed motion.

The following background facts are undisputed.  UCIL was incorporated in India in 1934.  In 1969, the Bhopal Plant begun operations as a pesticide formulations plant on land leased from the Indian State of Madhya Pradesh.  As a formulations plant, UCIL imported the chemical components of pesticide products and mixed the final product, such as the "Sevin" pesticide, in India.  At that time, UCC owned 60% of UCIL.  In the latter half of the 1970s, the Bhopal Plant was back-integrated into a facility capable of manufacturing the pesticides itself; in connection with this project, UCC's ownership interest in UCIL was reduced to 50.9%.

The Bhopal Plant operated as a manufacturing facility for only a few years.  In the normal course of operations, the Bhopal Plant generated wastes; generally, solid wastes were

7

disposed in on-site tanks and pits, while wastewater was treated and then pumped to three solar evaporation ponds lined with low density black polyethylene sheets.  Plaintiffs allege that toxic substances seeped into a ground aquifer, polluting the soil and drinking water supply in residential communities surrounding the former Bhopal Plant site.  In 1984, after a catastrophic gas leak claimed thousands of lives, the Government of India closed the Bhopal Plant.  In 1994, UCC sold its stake in UCIL; UCIL subsequently changed its name to EIIL.  In 1998, EIIL terminated its lease of the Bhopal Plant site and surrendered the property to the state government of Madhya Pradesh.

Plaintiffs bring negligence, public and private nuisance, and strict liability claims against UCC, seeking compensatory and punitive damages, as well as medical monitoring, for injuries allegedly caused by UCIL's Bhopal Plant operations. Relying almost exclusively on documents cited in the complaint and provided in discovery in the Bano case, Defendants move for summary judgment as to all theories of liability.

## II.    Discussion

Initially, Plaintiffs argue that summary judgment should be denied because Defendants' statement of undisputed material facts, supplied pursuant to Local Civil Rule 56.1, does not address all theories of liability in the complaint.  "Local Rule 56.1 permits — but does not require — the denial of a non-

compliant motion for summary judgment." Tota v. Bentley, 379 F. App'x 31, 33 (2d Cir. 2010) (affirming district court order granting defendants' motion for summary judgment despite their failure to comply with W.D.N.Y. Local Rule 56.1, which is textually identical to S.D.N.Y. Local Rule 56.1). To the extent there is any deficiency in the Rule 56.1 Statement, which was submitted in 2005, Defendants' memorandum of law, the 2005 Heck Declaration, and the exhibits thereto, provided more than adequate notice of "the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1. This case is nearing its eighth year on the docket; in order to ensure some measure of finality in these proceedings, the Court believes the liability issues should be resolved on the merits.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the evidence, "the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotations omitted); see Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to prevent summary judgment).

UCC is a New York corporation, while UCIL was incorporated pursuant to the laws of India.  Plaintiffs' initial and supplemental briefs cite New York law, and Defendants raise no objection to the presumptive applicability of New York law. Moreover, no party has suggested any inconsistencies between New York and Indian law such that New York law should not govern.

Plaintiffs' claims generally sound in nuisance.  A public nuisance "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency."  Copart Indus., Inc. v. Consolidated Edison Co. of New York, Inc., 362 N.E.2d 968, 971 (N.Y. 1977).

10

"It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to . . . endanger or injure the property, health, safety or comfort of a considerable number of persons." Id. (internal citations omitted). As Defendants have not raised the issue, the Court makes the generous assumption, but does not find, that Plaintiffs have standing to pursue a public nuisance claim.

In contrast, a private nuisance requires defendant's "invasion of another's interest in the use and enjoyment of land" that is "(1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." Id. at 971. Such invasion is considered intentional "when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct." Id. at 972-73. On the other hand, "whenever a [private] nuisance has its origin in negligence, negligence must be proven." Id. at 972. Whether public or private, "[o]ne who creates a nuisance through an inherently dangerous activity or use of an unreasonably dangerous product is absolutely liable for resulting damages, [regardless] of fault." State v. Schenectady Chemicals, Inc., 459 N.Y.S.2d 971, 976 (N.Y. Sup.

11

Ct. 1983), aff'd as modified, 479 N.Y.S.2d 1010 (N.Y. App. Div. 1984).

Admittedly, UCC itself never owned or occupied the Bhopal Plant site.  However, New York law provides that "[w]hile ordinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon, everyone who creates a nuisance or participates in the creation or maintenance of a nuisance are liable jointly and severally for the wrong and injury done thereby."  Id. (internal quotation omitted).  Thus, in Schenectady Chemicals, the New York court allowed the State of New York to pursue a public nuisance claim against a chemical manufacturer whose third party contractor disposed of waste that eventually caused groundwater contamination.  Cf. State of New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir. 1985) (holding corporate officer individually liable for costs of abatement of nuisance on land owned by the corporation because the officer himself "specifically directs, sanctions, and actively participates in [the corporation's] maintenance of the nuisance").[1]

---

[1] The Court can ascertain no relevant legal significance at all with respect to additional cases relied on by Plaintiffs.  See, e.g., Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 358 (2d Cir. 2000) (addressing joint tortfeasor liability in copyright infringement cases); Miller v. Rivard, 585 N.Y.S.2d 523, 527 (N.Y. App. Div. 1992) (allowing wife to maintain wrongful conception action against physician who negligently performed husband's vasectomy); Melodee Lane Lingerie Co. v. Am.

Thus, the central question in Defendants' renewed summary judgment motion is whether UCC participated in the creation or maintenance of groundwater pollution in Bhopal.  Plaintiffs posit several legal theories pursuant to which UCC may be held liable for their injuries.  First, Plaintiffs contend that UCC, acting in its own corporate capacity, directly or in concert with UCIL, participated in the creation of the pollution – namely by approving the back-integration of the Bhopal Plant, designing the Bhopal Plant's waste disposal systems, transferring technology to UCIL, by its knowledge of water pollution risks, and by its "intimate participation" in environmental remediation efforts.  Second, Plaintiffs claim that UCIL acted as UCC's general or specific agent and UCC ratified UCIL's acts after the fact.  Third, Plaintiffs allege that UCIL acted as UCC's alter ego, justifying piercing the corporate veil between parent and subsidiary.

### A.   Direct Liability

Neither Schenectady Chemicals nor Shore Realty concerned the corporate relationship at issue here, and courts do not look favorably on a direct participation theory of liability as an end-run around the presumption of separate corporate identity

---

Dist. Tel. Co., 218 N.E.2d 661, 664 (N.Y. 1966) (noting basic principle of negligence law that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all").

13

and veil-piercing requirements.  See Fletcher v. Atex, Inc., 861 F. Supp. 242, 246 (S.D.N.Y. 1994), aff'd, 68 F.3d 1451 (2d Cir. 1995) ("A failed effort to pierce the subsidiary's corporate veil cannot be converted into a successful concerted action claim."); Gunther v. Capital One, N.A., 703 F. Supp. 2d 264, 277 (E.D.N.Y. 2010) ("It is the basic rule of the corporate form that shareholders are not liable for the acts of a corporation unless there is a reason to lift the corporate veil.  This is not avoided by merely asserting that a shareholder authorized, ratified, or directed the actions of the corporation."); see also Esmark, Inc. v. N.L.R.B., 887 F.2d 739, 759 (7th Cir. 1989) ("direct participation" theory of liability "limited to situations in which the parent corporation's control over particular transactions is exercised in disregard of the separate corporate identity of the subsidiary").  Nevertheless, the Supreme Court has noted that "derivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of.'  In such instances, the parent is directly liable for its own actions."  United States v. Bestfoods, 524 U.S. 51, 64-65 (1998) (quoting William O. Douglas & Carrol M. Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 207-08 (1929)).

14

### 1.    Approval of Back-Integration

First, Plaintiffs seek to hold Defendants directly liable because Defendants approved the decision to back-integrate the Bhopal Plant.  As discussed earlier, the Bhopal Plant originally formulated, but did not manufacture, pesticides.  However, in the 1970s, the Government of India put in place new restrictions "requir[ing] that local manufacture replace imports as soon as feasible."  (2005 Heck Decl., Ex. D1 at UCC04195).  To solve this problem, UCIL proposed to back-integrate the Bhopal Plant to manufacture pesticides.  A December 2, 1973 cover letter forwarding UCIL's 1973 Capital Budget Proposal to the UCC Management Committee states:

> Attached is a proposal by Union Carbide India Limited to manufacture methyl-isocyanate based agricultural chemicals in India, beginning with Sevin and Temik. Manufacture is necessary in support of the market already developed by UCIL because the Government of India (GOI) will not permit further imports of Sevin and Temik if this proposal is not implemented.
> . . .
> By Government requirement all possible work in engineering and construction will be done in India with UCIL assuming an overall responsibility for implementation of the project.

(Id. at UCC04186-87).  UCIL proposed to fund the $20 million back-integration project itself and informed UCC's Management Committee that "no direct equity contribution nor loan guarantee will be required of UCC."  (Id. at UCC04187).  However, "the financial arrangements will be affected by Government of India

legislation requiring a dilution of foreign held equity whenever new capital expenditures are made." (Id. at UCC04189). Therefore, UCIL "is required by the Government of India (GOI) to raise 25% of the estimated cost of expansion through the issue of new equity to the local shareholders and Indian public," an issuance that would dilute UCC's stake in UCIL. (Id. at UCC04189-90). UCC's Management Committee "endorsed" UCIL's Capital Budget Proposal for the back-integration of the Bhopal Plant on December 10, 1973. (2005 Heck Decl., Ex. D5 at UCC04240). In February 1977, UCIL prepared a review of its 1973 Capital Budget proposal, revised to portray "substantial changes in conditions from those assumed in the original CBP." (Handley Decl., Ex. I at UCC04684). Importantly, however, the 1977 Capital Budget Proposal Review reiterates the fact that UCIL proposed the back-integration project and that "UCIL has elected with the concurrence of UC Eastern to implement an equity reduction to 50.9%." (Id. at UCC04693, UCC04695).

Although Plaintiffs suggest that the idea for back-integration was at least partially UCC's, the documents do not support that assertion. In a January 24, 1985 affidavit, Edward Munoz, a former UCC employee, states that "[i]n 1966 he was sent to India by Union Carbide Corporation to investigate the feasibility of establishing pesticide manufacturing facilities in India." (Handley Decl., Ex. TT at ¶ 2). Mr. Munoz

ultimately "determined that a pesticide plant was feasible," and he goes on to describe his involvement with the engineering and construction of the plant in the 1960s, as well as additional engineering and construction involving the plant post-1973. (Id. at ¶¶ 5, 7). Given the Bhopal Plant's known history as a formulations plant back-integrated into to a manufacturing plant, it appears that Mr. Munoz's language was imprecise in that he was referring to a 1966 study of the feasibility of pesticide formulations facilities, not manufacturing facilities. In any event, even if UCC did explore the possibility of a pesticide manufacturing plant as early as 1966, there is no evidence that UCC took any steps to erect such a plant; indeed, manufacturing facilities were only constructed after UCIL undertook to do so itself.

There is no dispute that UCIL, acting under pressure from the Government of India, proposed a major capital expenditure that would transform the nature of operations at the Bhopal Plant. It is entirely unsurprising that UCC's Management Company would review such a significant proposal, nor is it surprising that some kind of approval by the parent would be required where the subsidiary planned to reduce the parent's equity ownership. See Fletcher, 861 F. Supp. at 245 ("[I]t is entirely appropriate for a parent corporation to approve major expenditures and policies involving the subsidiary, and for

17

employees of the parent and subsidiary corporations to meet periodically to discuss business matters."). Plaintiffs offer no legal authority for the proposition that implementing and following an internal review process for a subsidiary's capital expenditures, in and of itself, is tortious conduct; it does not, as a matter of law, rise to the level of participation in the creation of pollution. Furthermore, nothing in the 1973 Capital Budget Proposal, the minutes of the UCC Management Committee meeting in which UCC endorsed the Capital Budget Proposal, or the 1977 Review of the Capital Budget Proposal suggests that UCC directly participated in any polluting activity. Instead, these documents indicate that the manufacturing processes and waste disposal systems to be implemented at the Bhopal Plant were all initially proposed by UCIL. (2005 Heck Decl., Ex. D1 at UCC04204-06, UCC04212-14).

## 2. Design of Waste Disposal Systems

Next, Plaintiffs argue that UCC can be held directly liable because it designed the faulty waste disposal systems installed at the Bhopal Plant. However, the documents cited simply do not establish that UCC was responsible for such design. In May 1972 negotiations with the Government of India to obtain an allotment of land on which to construct a pesticide manufacturing plant, UCIL informed public health authorities in Bhopal that "the exact design of the effluent treatment unit is in process . . .

18

[and that] such work will be carried out by a consulting engineering company of repute who are specialized in design of effluent treatment and disposal, under the guidance of our Principals' Engineering Department." (Handley Decl., Ex. J at UCC04769). It appears that UCC did offer limited guidance to UCIL, but it does not follow that UCC designed the Bhopal Plant's waste disposal facilities. For example, in a memorandum dated July 21, 1972, UCC reported a "preliminary evaluation . . . of the waste disposal problems for the proposed SEVIN unit to be located in Bhopal, India." (2005 Heck Decl., Ex. D3 at UCC04127). In the memorandum, UCC presented a "proposed system for neutralizing and disposing of the acid-bearing process wastes," including using limestone pits to neutralize hydrochloric acid waste and an evaporation pond for the disposal of wastewater. (Id. at UCC04128-29). However, UCC explained that the "waste disposal evaluation has been based on very preliminary and incomplete information" and was undertaken not to set forth a definitive or mandatory design of the Bhopal Plant's waste disposal facilities, but to "(a) provide a basis for estimating investment and operating cost, (b) recommend further development, and (c) serve as a basis for negotiations with the Indian Government." (Id. at UCC04127).

Similarly, on June 15, 1973, Mr. G. R. Hattiangadi of UCC sent a memorandum to several UCIL employees commenting on UCIL's

19

waste disposal plans.  (Handley Decl., Ex. G).  In that memorandum, UCC noted that UCIL "recommended neutralization of [waste hydrochloric acid] using limestone," a procedure UCC found to be "perfectly acceptable," (id. at UCC04545), and offered observations on UCIL's evaporation pond concept, which was "somewhat different" from UCC's concept.  (Id. at UCC04546).  However, UCC had previously confirmed that "[a]fter he transmits the comments he has prepared on the proposals that have been made in India, Mr. Hattiangadi has no further obligation to provide general information on the disposal of plant wastes – other than any reviews or consultations that may be specifically requested by personnel in India."  (Handley Decl., Ex. F at UCC04544).  UCC went on to clarify that Mr. Hattiangadi would not "issue a general criteria report like those that we issued for [illegible] storage, etc."  (Id.).  UCC did provide something in the nature of a "criteria report" – that is, a report laying out UCC's "performance and design requirements" – for the waste liquid incinerator to be used at Bhopal.  (2005 Heck Decl., Ex. D4 at UCC04175).  However, even in that case, UCC noted that it "has no in-house capability to design the incinerator hardware, [so] this report was written in the form of an inquiry specification to allow the UCIL project group to obtain bids from local vendors."  (Id. at UCC04174).  In other words, UCC specifically informed UCIL of the limited role it

20

could and would play with respect to the design of the Bhopal Plant's waste disposal system.  Cf. 2005 Heck Decl., Ex. D1 at UCC04187 ("By Government requirement all possible work in engineering and construction will be done in India with UCIL assuming an overall responsibility for implementation of the project.").

Documents discussing UCIL's purchase from UCC of "design packages" consisting of the technical guidelines for the process of manufacturing pesticides also confirm UCC's limited role in the design of waste disposal facilities.  In a July 12, 1973 memorandum, UCC acknowledged that it "has been commissioned to supply certain portions of the process technology for the India SEVIN Project," but also noted "the desire by UCIL to perform as much of the design as possible in India," such that "many portions of the design that would normally be performed at the Technical Center as an extension of the process design will instead be transferred in whole or in part to India."  (Handley Decl., Ex. MM at UCC12132).  Consequently, UCC's memorandum explicitly defined the division of responsibilities between UCC and UCIL with respect to design of the Bhopal Plant.  (Id.). The memo states in no uncertain terms that "UCIL will have the primary responsibilities for designing and providing the . . . facilities for . . . disposal of wastes."  (Id. at UCC12141; see also id. at UCC12133 ("Union Carbide India Limited (UCIL) is

21

responsible for the overall venture.  This includes responsibility for the plant design and construction . . . [and] the contracting of the detailed design of all the facilities.")).  Indeed, the February 1974 Design Transfer Agreement, pursuant to which UCIL purchased manufacturing process design packages from UCC makes no mention of designs for waste disposal facilities.  (Handley Decl., Ex. LL at UCC12071).

Plaintiffs also rely on a December 31, 1973 Methyl Isocyanate and "Sevin" Carbamoylation Units Wastewater Collection System Design Report prepared by the Chemicals and Plastics Division of UCC.  That report merely describes "necessary function of design, construction, and materials procurement" for a wastewater collection system, namely underground drainage and sewer pipes.  (2005 Heck Decl., Ex. D6 at UCC04249).  Appended to the Design Report are what appear to be the Chemicals and Plastics Division's generic Standard Operating Procedures for the construction, (id. at UCC04266-73), design, (id. at UCC04274-77), and testing (id. at UCC04278-81), of any underground sewer and drain system.  The report contains criteria for the wastewater collection system, not the design itself, and in no event specifies a system for the treatment and disposal of effluent at the Bhopal Plant.  Moreover, UCC informed UCIL that this design report and the June 15, 1973 memorandum submitting comments on UCIL's waste disposal plans,

22

(Handley Decl., Ex. G), "will conclude formal [UCC] input on waste disposal requirements for the India SEVIN Unit." (Id. at UCC04547).

It is true that in a letter dated December 9, 1972, UCIL represented to Bhopal public health authorities that its waste disposal plans "are based on the best available know-how and experience at the disposal of Union Carbide India Limited. The proposed methods are accepted standards incorporating latest designs in this field of technology and are in use at the plant of the Principals of Union Carbide India Ltd., in the United States." (Handley Decl., Ex. K at UCC04778). This establishes nothing more than UCIL's intention to adopt "standard" waste disposal "methods," such as acid neutralization pits and solar evaporation ponds, which were also used by UCC. It does not establish that UCC dictated the design of the waste treatment and disposal system actually constructed at the Bhopal Plant. Indeed, the evidence is to the contrary.

First and foremost, the February 7, 1976 report which "describes proposed Waste Disposal Facilities for the Pesticides Plant of Union Carbide India Limited at Bhopal, India" was prepared by the Engineering Department, Agricultural Products Division, Union Carbide India Limited. (Handley Decl., Ex. FF at UCC04638, UCC04640). It was approved by Mr. L. J. Couvras, a UCIL employee. (Id. at UCC04638). Although Plaintiffs contend

23

that UCC designed the solar evaporation ponds, UCC's only input was preliminary and did not include actual construction parameters.  Moreover, the actual ponds constructed at the Bhopal Plant differ from UCC's early suggestions, further indicating that such facilities were UCIL's design.  For example, UCC's July 21, 1972 preliminary study of waste disposal at Bhopal notes "[t]o avoid danger of polluting subsurface water supplies in the Bhopal area, this [evaporation] pond should be lined with clay suitable for rendering the pond bottom and dikes impervious to water."  (2005 Heck Decl., Ex. D3 at UCC04129). In January 1977, however, Humphreys & Glasgow, UCIL's engineering consultants, determined that construction of solar evaporation ponds as originally conceived would be too costly. (Handley Decl., Ex. HHH at UCC04922).  Thus, UCIL and its engineering consultants devised a last-minute "alternative scheme for the Pond so as to effect cost reduction," using a polyurethane lining in the evaporation ponds to "reduce use of expensive murum and non-swelling clay" and eliminating a catch drain.  (Id. at UCC04922-23).

Similarly, UCC's June 15, 1973 comments on UCIL's waste disposal plans note that UCIL was interested in building a 13-acre solar evaporation pond with a life expectancy of nine months, but UCC opined that "[s]izing a pond for a life expectancy of under a year . . . is not advisable" and suggested

24

a 35-acre pond.  (Handley Decl., Ex. G at UCC04546-47).

Nevertheless, UCIL's February 7, 1976 Waste Disposal System:

Description of Facilities report conveys UCIL's plan to

construct a 10-acre evaporation pond anticipated to "last about

four months after Phase II goes into operation, then a second

pond will have to be constructed."  (Handley Decl., Ex. FF at

UCC04654).  Ultimately, one 4-acre evaporation pond with an

estimated life of 4 years, one 18-acre evaporation pond, and a

third back-up pond were built on a 35-acre tract of land.  (2005

Heck Decl., Ex. C at UCC00178; Ex. D7 at UCC01705).

Finally, Plaintiffs' argument that UCC endorsed the idea of

spraying liquid from the evaporation ponds into the air

misrepresents the document.  In fact, UCIL requested UCC's input

about a pond spraying system design, and UCC responded that

"[i]f you [UCIL] feel aeration is necessary in your situation,

the normal practice is to bubble air through the liquid.

However, spraying of liquid into the air should be equally

effective."  (Handley Decl., Ex. H at UCC04594) (emphasis

added).  This document perfectly encapsulates the relationship

between UCC and UCIL with respect to waste disposal design –

UCIL may have consulted UCC about its plans early on, but UCIL

was the ultimate decision maker, so primary responsibility for

the design and construction of the waste disposal system at the

Bhopal Plant rested with UCIL.  The record with respect to waste

disposal design presents no dispute of material fact about UCC's participation in the creation of pollution.

### 3.    Technology Transfer

It is beyond dispute that UCIL generated and disposed of the waste which allegedly polluted Plaintiffs' drinking water. In an attempt to attach liability to Defendants, Plaintiffs now argue that UCC participated in the creation of a nuisance by transferring, approving, or overseeing all of the manufacturing technology which, by its use at the Bhopal Plant, generated toxic waste.  Although manufacturing processes produce waste in the normal course, it cannot be said that the decision to produce pesticides automatically equates to the creation of a nuisance.  Plaintiffs' evidence suggests that any groundwater pollution was caused by the disposal of waste at Bhopal, not the technology which generated by-product waste.  Plaintiffs offer no basis for the contention that the technology itself was polluting other than its allegedly "improper, inadequate and unproven" status.  (Compl. ¶¶ 78-79).  Premising liability against the parent on the technology used at UCIL, without specific indication that the technology was both provided by UCC and caused pollution, in and of itself, is tantamount to holding UCC responsible for the overall insecticide manufacturing operations of its subsidiary; such liability is precluded absent piercing of the corporate veil.

26

Nevertheless, the evidence suggests that any unproven technology used at Bhopal was developed by UCIL.  UCIL's 1973 Capital Budget Proposal envisioned that the Bhopal Plant would include facilities for the manufacture of carbon monoxide ("CO"), phosgene, methyl isocyanate ("MIC"), 1-naphthol,[2] and Sevin.  (2005 Heck Decl., Ex. D1 at UCC04202).  The Capital Budget Proposal contemplated that UCC would provide UCIL with technology for the production of phosgene, MIC, and Sevin. (Id.).  UCC's phosgene, MIC, and Sevin processes were operated commercially – that is to say, proven - whereas its CO process was only "conceptual," and its 1-naphthol process was still in the "pilot plant" stage.  (Id.; Handley Decl., Ex. I at UCC04705).  In any event, UCC's CO process was "unsuitable because it is based on methane, which is unavailable at Bhopal. . . .  Instead, UCIL has elected to develop its own process, based on coke, with the help of an India-based consultant." (2005 Heck Decl., Ex. D1 at UCC04204).  UCIL's 1977 review of the Capital Budget Proposal noted that ultimately "UCIL abandoned the earlier plan to develop its own process for CO; instead, it selected the Stauffer process which had been proven commercially . . . .  The Stauffer process was purchased thru [sic] UCC."  (Handley Decl., Ex. I at UCC04705; Ex. NN (UCIL

---

[2] CO, phosgene, MIC, and naphthol are intermediary chemical compounds required for the production of Sevin.  (Handley Decl., Ex. RR at 227).

sublicensed the desired Stauffer technology through UCC)).

Similarly, UCC's 1-naphthol process "involves sophisticated

technology [and] equipment requiring unusual materials of

construction and is best suited to large-scale production.  The

Indian environment is not favorable in any of these respects."

(2005 Heck Decl., Ex. D1 at UCC04204).  Therefore, "UCIL has

developed a process requiring less technical knowledge to

operate and fewer alloys."  (Id. at UCC04205).  UCIL encountered

"[s]evere operating problems" with its naphthol operations.

(Handley Decl., Ex. RR at 228).  Although UCIL requested "UCC's

assistance to sort out the [naphthol] process problems," (id.),

there is no evidence to suggest that UCC in fact provided any

naphthol technology to UCIL, and UCIL ultimately shut down the

naphthol plant in 1982.  (Id.; see 2005 Heck Decl., Ex. D19 at

UCC03791).  There can be no liability for UCC with respect to

any pollution caused by UCIL's CO or naphthol manufacturing

because UCIL developed that technology, to the extent it was

used at all, on its own.

The 1973 Capital Budget Proposal contemplated that UCIL

would use the "MIC-to-Sevin process, as developed by UCC."

(2005 Heck Decl., Ex. D1 at UCC04206).  Although UCIL purchased

design packages for the manufacture of Sevin from UCC in 1974,

the 1977 review of UCIL's Capital Budget Proposal reports that

"SEVIN batch carbamoylation and [1-naphthol] processes were

28

developed by UCIL and have been fully evaluated on pilot plants. The simplicity of the process, and experience acquired on pilot plant operations indicate that no significant risk is involved with the SEVIN process."  (Handley Decl., Ex. I at UCC04704; see 2005 Heck Decl., Ex. D19 at UCC03791 (noting that in 1975 "'Sevin' carbamoylation process (batch) developed")).  The fact that UCIL evaluated a Sevin batch carbamoylation process in pilot plants indicates that it was a new manufacturing process, different from UCC's commercially operated Sevin manufacturing process.  (2005 Heck Decl., Ex. D1 at UCC04202).  Furthermore, the 1977 review notes that the "SEVIN and [1-naphthol] processes have been improved," resulting in savings in fixed investment, savings in waste treatment costs, and improvement in plant costs as compared to the budgeted amounts, which were based on the use of UCC's MIC-to-Sevin process.  (Handley Decl., Ex. I at UCC04704).  Thus, the evidence demonstrates that the allegedly unproven and improper technology used at the Bhopal Plant was selected and/or developed by UCIL, not UCC.

Plaintiffs additionally argue that UCC is liable for participating in the creation of a nuisance because it reviewed UCIL's design process and provided other technical services to UCIL.  UCC and UCIL agreed from the start that UCC "will provide the basic process design" for some manufacturing processes but "[d]etailed engineering will be provided by the Bombay office of

29

Humphreys and Glasgow." (Handley Decl., Ex. ZZ at 1). Indeed, the design report packages provided by UCC did "not incorporate features unique to India." (Handley Decl., Ex. MM at UCC12135; see Handley Decl., Ex. OO)). Thus, UCIL was responsible for "modify[ing] the process, the equipment, and the engineering standards as necessary to adapt the process design to the equipment and materials available in India." (Handley Decl., Ex. MM at UCC12143). While UCIL agreed to provide change notices to UCC for design modifications, UCC's participation was limited to "major changes" in design aspects such as plant capacity, raw material specifications, and materials of construction. (Id.). Moreover, although the parties provided for UCC's review of design changes, there is no evidence that such review and approval ever occurred, particularly since UCIL developed its own CO, 1-naphthol, and Sevin processes. Any other technical assistance that UCC provided to UCIL was performed in accordance with a 1973 Technical Services Agreement, pursuant to which UCC agreed to offer training and instructions for technical personnel, for a fee and only "upon the request of UCIL." (Handley Decl., Ex. JJ at UCC12006). Finally, there is no allegation that UCC's review of design changes or provision of technical services was negligently performed or in any way contributed to the creation of pollution.

30

### 4.   UCC's Knowledge of Waste Disposal Problems

Plaintiffs argue that UCC is liable for negligence because it transferred technology it knew to pose water pollution risks or because it failed to act to prevent pollution.  As discussed above, the allegedly improper and inadequate technology used at the Bhopal Plant was either selected or developed by UCIL, not UCC.  Moreover, UCIL designed the waste disposal system for the Bhopal Plant.  The fact that UCC recognized potential waste disposal issues does not give rise to the extensive liability Plaintiffs suggest, particularly in light of the record evidence.

First, Plaintiffs' theory of negligence is legally untenable.  In Fletcher v. Atex, a case involving Kodak, the parent company, and Atex, the subsidiary, the court dismissed claims against Kodak premised on its alleged participation in Atex's manufacture of keyboards which caused users to develop carpal tunnel syndrome.  The court held that:

> The plaintiffs also seem to contend that because Kodak was generally aware that use of keyboards could contribute to repetitive stress injuries, it acted tortiously either by failing to prevent Atex from manufacturing the keyboards, or by failing to warn the plaintiffs about the danger.  However, absent a "special relationship" between Kodak and Atex, or Kodak and the plaintiffs, Kodak had no duty to control Atex's conduct to prevent harm to the plaintiffs. Restatement (Second) of Torts § 315 (1965).  The parent/subsidiary relationship is not, without more, a "special relationship" in this sense.

861 F. Supp. at 246-47; see Quinn v. Thomas H. Lee Co., 61 F. Supp. 2d 13, 20 (S.D.N.Y. 1999) (dismissing negligence claim against parent company where "plaintiff alleges no relationship between plaintiff and defendant sufficient to impose a duty of care upon defendant" as"[t]he only connection between plaintiff and the Lee defendants is that Thomas H. Lee Company was the majority shareholder in American Health Companies, of which DCI was a wholly-owned subsidiary").  Similarly, Plaintiffs have not alleged any special relationship between UCC and UCIL - certainly no relationship beyond that of parent and subsidiary - nor is there any allegation of a relationship between UCC and Plaintiffs that would give rise to a duty on UCC's part to change UCIL's waste disposal plans for the Bhopal Plant.

Plaintiffs seem to suggest that UCC's knowledge that pesticide manufacturing processes produce waste, coupled with the knowledge that the Bhopal site did not have a waterway for the disposal of treated waste, gave rise to a duty to act.  In a May 16, 1972 memorandum on the topic of UCIL disposal of by-product hydrochloric acid, a UCC employee commented that "I cannot believe that we at the Tech Center would be held blameless if we recognize potential problems here and did not speak up."  (Handley Decl., Ex. C at UCC04516).  But UCC did speak up, numerous times.  In a July 21, 1972 memorandum, Mr. Hattiangadi of UCC identified "acid-bearing process wastes" as

"clearly the major disposal problem" for the proposed back-integration project because the Bhopal site did not have a "nearby waterway into which treated effluent can be discharged," and sent the memorandum to at least one person who worked at UCIL, Mr. L. J. Couvaras.  (2005 Heck Decl., Ex. D3 at UCC04127-28).  That memorandum suggests UCIL employ a clay lining for the evaporation pond "[t]o avoid danger of polluting subsurface water supplies."  (Id. at UCC04129).  Mr. Hattiangadi sent another memorandum to several UCIL employees on June 15, 1973 commenting on UCIL's waste disposal plans for the Bhopal Plant and making pond size suggestions UCIL may not have followed. (Handley Decl., Ex. G at UCC04546).  There can be no question that UCIL was well aware of the need to devise a waste disposal system appropriate for the Bhopal site and its lack of waterway. For example, UCIL's 1973 Capital Budget Proposal includes an allotment of funds for the treatment and disposal of the "waste streams of major concern," i.e., streams that are "toxic and acidic," using evaporation ponds.  (2005 Heck Decl., Ex. D1 at UCC04205).  However, with full knowledge of the potential problems, UCIL undertook the responsibility to design the necessary waste disposal system in accordance with Government of India regulations.  (Handley Decl., Ex. MM; Ex. N at UCC05279; Ex. O at UCC05282 (Government of India required that waste be disposed in solar evaporation ponds)).

33

**5.   UCC's "Intimate Participation" in Site Rehabilitation**

Plaintiffs argue that UCC participated in the creation of a nuisance through its intimate involvement in the inadequate clean-up of the Bhopal site.  First, Plaintiffs claim that UCC approved the disposal of acid sludge, but they can do so only by mischaracterizing the evidence.  In May 1986, after the Bhopal Plant had been shut down, UCIL informed UCC that it needed to dispose of sludge in tanks, but had "not been able to find a safe practical and acceptable method of cleaning these tanks." (2005 Heck Decl., Ex. D14 at UCC01758; Ex. D16 at UCC01760).  By letter dated September 2, 1986, UCC forwarded to UCIL cleaning procedures recommended by DuPont and the Manufacturing Chemists Association, but noted that UCC has "no additional advice to offer for removal of the sludge."  (2005 Heck Decl., Ex. D15 at UCC01740).  Thereafter, UCIL performed experiments at Bhopal and, in October 1987, proposed a sludge neutralization and disposal plan on its own.  (2005 Heck Decl., Ex. D17 at UCC01728).  In the memorandum, UCIL suggested that an "on-site joint review be held" to finalize the plan for sludge disposal, but there is no evidence that such joint review ever occurred. (Id.).  Plaintiffs also point out that in 1988, UCC provided UCIL with guidelines for the disposal of Sevin and naphthol tars; however, the document cited specifically states that, despite this guidance, UCIL is "not in a position to develop any

34

proposal for disposal of the two tarry residues." (2005 Heck Decl., Ex. D18 at UCC02069). Ultimately, in 1991, the Government of Madhya Pradesh directed UCIL to dispose the tarry residues by incineration, a decision that in no way implicates UCC. (2005 Heck Decl., Ex. D41 at UCC03667; Ex. D43 at UCC02063).

Next, Plaintiffs claim that UCC and UCIL jointly designed a Bhopal Site rehabilitation and asset recovery project which failed to prevent water pollution and left the Bhopal Plant site a nuisance. Although UCIL certainly kept UCC apprised of its remediation plans and progress, the evidence shows that UCIL, along with the National Environmental Engineering Research Institute ("NEERI") and its consultant Arthur D. Little, directed the Bhopal remediation project in accordance with the direction of the Government of India.

Some time after the catastrophic 1984 gas leak, the Government of Madhya Pradesh expressed interest in reclaiming that part of the Bhopal Plant site where the three solar evaporation ponds were located to establish an industrial estate benefitting gas victims. (2005 Heck Decl., Ex. D49 at UCC03336). The Government of Madhya Pradesh retained NEERI in 1989 to investigate potential environmental damage caused by waste disposal in the evaporation ponds and to propose decontamination procedures. (2005 Heck Decl., Ex. C at

35

UCC00109).  In April 1990, NEERI issued a report finding no land or water contamination in the area of the evaporation ponds: "The overall conclusion of the study is that no contamination of soils and ground water was observed due to the impoundment of wastewater in solar evaporation ponds."  (Id. at UCC00128). NEERI recommended that "Pond III can be converted into a secure landfill to contain the sediments and contaminated soil leaving 11 hectares of [solar evaporation pond] area for reuse."  (Id. at UCC00109).

Leakage from this landfill is at the heart of Plaintiffs' nuisance claim.  Although the complaint alleges that UCC "clearly approved the landfill option," (Compl. ¶ 114), Plaintiffs have adduced no evidence substantiating that claim. Instead, the decision to bury toxic waste in the former evaporation pond was proposed by NEERI and mandated by the Government of India.  Internal UCC documents confirm that UCIL would "appoint NEERI to initiate their assessment of both the major site and ponds and develop in conjunction with [UCIL's consultant Arthur D. Little] a remediation strategy for both locations."  (2005 Heck Decl., Ex. D52 at 03507).  After UCIL "develop[ed] with NEERI/ADL remediation program" for the solar evaporation ponds, "UCIL, using contractors and in accord with NEERI/ADL direction will implement remediation." (Id. at UCC03508; Ex. D30 at UCC02049 (UCC memorandum confirms that

36

"responsibility for the investigation of and any future rehabilitation of the Bhopal site rests with the affiliate, UCIL")).  In turn, NEERI issued another report in 1992 again recommending an environmental management plan for "containment of pond contents in a secure landfill."  (2011 Heck Decl., Ex. 8 at UCC03054).  Madhya Pradesh and the Government of India endorsed NEERI's plan to create a landfill.  Madhya Pradesh Pollution Control Board notes regarding the UCIL plant state that "[a]ccording to the recommendations of NEERI, the order for converting Pond No. 3 into secured [landfill] has been issued by this office."  (2005 Heck Decl., Ex. D64 at UCC01951).  UCIL informed the Government of India that the "location of [a] suitable landfill in the Pond III was finalized based on the Report titled 'Process Package for Disposal of SEP Contents at UCIL Bhopal,' submitted by NEERI, Nagpur in November 1992 and accepted by [Madhya Pradesh] Pollution Control Board."  (2005 Heck Decl., Ex. D66 at UCC02703).

UCIL certainly communicated with UCC, and employees of each company attended meetings to discuss remediation plans and progress.  (2005 Heck Decl., Ex. D19 at UCC 03790 (1989 site rehabilitation meeting at South Charleston); Ex. D34 at UCC01858 (meeting at UCC Danbury headquarters); Ex. D38 at UCC02361 (UCIL employees met with UCC scientists to learn about water and soil sampling techniques)).  But there is no evidence, either in

37

meeting minutes or otherwise, to suggest UCC's "intimate participation" in the Bhopal Plant clean-up, and certainly no evidence that UCC approved the creation of a landfill in a solar evaporation pond.  Finally, Plaintiffs base liability on a "soil washing" effort at Bhopal prior to the creation of the landfill, purportedly directed by UCC, pursuant to which liquid from two ponds was pumped into the third pond.  However, the documents indicate that UCIL undertook the soil washing experiment, (2011 Heck Decl., Ex. 8 at UCC03062), and, more importantly, the pumping and soil washing had no environmentally destructive effects as there was no seepage from the ponds.  (Id. at UCC03063).

The Court has carefully considered all of the documents in the expanded summary judgment record and finds no evidence that UCC's involvement, if any, in the back-integration scheme, waste disposal plans, technology development, and remediation created or maintained an environmental nuisance at Bhopal.  In reality, Plaintiffs' theory of direct liability is nothing more than an attempt to hold a parent company liable for the subsidiary's actions without satisfying strict veil-piercing requirements.

### B.    Concerted Action Liability

"The theory of concerted action provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a common plan

or design to commit a tortious act." Rastelli v. Goodyear Tire & Rubber Co., 591 N.E.2d 222, 224 (N.Y. 1992) (citations omitted). "It is essential that each defendant charged with acting in concert have acted tortiously." Id.

Plaintiffs have not adduced evidence that both UCC and UCIL participated in the creation of a nuisance. The only conduct attributable to UCC is the endorsement of UCIL's 1973 Capital Budget Plan, which is not in and of itself a tort, and the provision of design packages and certain technical services to UCIL pursuant to contractual agreements. (Handley Decl., Exs. JJ, LL). The Court has already determined that any unproven technology used at Bhopal was developed by UCIL. Moreover, there is no allegation or evidence that training or other technical assistance UCC provided to UCIL pursuant to a November 1973 Technical Services Agreement was performed negligently or in any way contributed to environmental pollution at Bhopal. Nor is there evidence of an agreement to pollute, as, for example, UCC's July 21, 1972 preliminary study of waste disposal at Bhopal only gave UCIL suggestions to help avoid pollution of subsurface waters. (2005 Heck Decl., Ex. D3 at UCC04129).

### C.   Agent Liability

"Suing a parent corporation on an agency theory is quite different from attempting to pierce the corporate veil. In the first instance, the claim against the parent is premised on the

view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf - that is, in the name of the parent." Royal Indus. Ltd. v. Kraft Foods, Inc., 926 F. Supp. 407, 412 (S.D.N.Y. 1996). To establish an agency relationship, plaintiff must put forth "facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003); see Rubin Bros. Footwear, Inc. v. Chem. Bank, 119 B.R. 416, 422 (S.D.N.Y. 1990) (to establish actual agency: "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking"). "When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for a tort committed by the agent while acting within the scope of the agency." Maung Ng We v. Merrill Lynch & Co., Inc., No. 99 Civ. 9687, 2000 WL 1159835, at *5 (S.D.N.Y. Aug. 15, 2000).

Plaintiffs seem to think that their agency claim is uncontested, a faulty contention considering the fact that Defendants have moved against all of Plaintiffs' direct and concerted action claims. The sole relevant allegation in the complaint is that UCC "exercised sufficient actual control over

UCIL, its Indian affiliate, that the latter was merely the general or specific agent, or the alter ego of the former." (Compl. ¶ 60).  There is some question about whether the complaint even pleads an agency theory of liability, as there is no allegation of the principal's manifestation of the agent's authority to act.  The single agency allegation is focused on the control element, and seems more directed towards alter-ego liability.

Nevertheless, there can be no question that Defendants disputed the existence of a factual issue on the question of UCC's control of UCIL.  "It is one thing to 'consult' with, or obtain 'recommendations' or approval from a parent corporation. It is quite another for the parent's approval to be <u>required</u> before the subsidiary can act."  <u>Maung Ng We</u>, 2000 WL 1159835, at *7.  The summary judgment record certainly indicates that UCIL consulted with UCC about its waste disposal plans and on non-environmental business matter like its strategic plan. However, nothing in the evidence suggests the necessity of UCC's approval for the actions about which Plaintiffs complain. Moreover, there is no evidence in this extensive record indicating that UCIL manufactured pesticides on UCC's behalf, entered into contracts or other business dealings on UCC's behalf, or otherwise acted in UCC's name.

Plaintiffs also argue that they have an uncontested agency claim based on UCC's ratification of UCIL's acts after the fact. However, ratification does not give rise to the agency relationship itself.  Instead, ratification is a means by which the principal can be held liable for the unauthorized acts of its agent, but it presupposes an agency relationship which simply is not present between UCC and UCIL.  See Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1062 (2d Cir. 1992); Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd., 835 F.2d 32, 36 (2d Cir. 1987) ("Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement.").  In the Court's view, Plaintiffs' agency theory is yet another attempt to circumvent the veil-piercing requirements, but, in the absence of any evidence supporting this theory, summary judgment in favor of Defendants is warranted.

### D.    Alter Ego Liability

Although they previously agreed to the application of New York law and cite New York law throughout their motion papers with respect to all other theories of liability, Plaintiffs now claim that the law of India, UCIL's place of incorporation, governs their veil-piercing claim.  See Fletcher, 861 F. Supp. at 244 (corporate veil piercing follows law of state of

incorporation).  Plaintiffs cite only one case in support of their contention that the laws of India and New York differ with respect to veil piercing, and argue that Indian law treats corporate groups involved in hazardous activities as a single entity.  However, only an intentionally obtuse reading of the case could lead the Court to that conclusion.  In M.C. Mehta v. Union of India, A.I.R. 1987 S.C. 1086 (India), the court set out a rule of absolute liability for an "enterprise" engaged in hazardous or inherently dangerous industry.  (Handley Decl., Ex. GGG).  The M.C. Mehta case involved an oleum gas leak at a plant operated by Shriram Food and Fertilisers Industries, and nothing therein suggests that Shriram was a subsidiary or owned a subsidiary or was in any way a member of a corporate group. Thus, the Indian court's reference to Shriram as an "enterprise," a synonym for the word "company," cannot possibly be interpreted to mean that Indian law disregards the separate corporate identities of a parent and subsidiary in hazardous waste cases.  As Plaintiffs have offered no other authority suggesting material differences in the laws of India and New York on this point, the Court applies New York law.

It is a bedrock principle of New York law that a parent corporation is not liable for the actions of a subsidiary absent extraordinary circumstances justifying piercing the corporate veil.  See Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979)

43

(noting that "New York courts disregard corporate form reluctantly").  The concept of veil-piercing "is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed.  Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners." Morris v. N.Y. State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160 (N.Y. 1993).  Such facts and circumstances include the need "to prevent fraud or to achieve equity."  Billy v. Consol. Mach. Tool Corp., 412 N.E.2d 934, 941 (N.Y. 1980).

Under New York law, plaintiff may pierce the corporate veil where there is evidence showing "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997); see Thrift Drug, Inc. v. Universal Prescription Adm'rs, 131 F.3d 95, 97 (2d Cir. 1997); cf. Life Ins. Corp. of India v. Escorts Ltd., A.I.R. 1986 S.C. 1370, 1418 (India) (Indian courts will pierce the corporate veil to prevent "fraud or improper conduct").  Courts consider a number of factors in determining domination, including:

44

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991).  "While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required."  Morris, 623 N.E.2d at 1161.  In other words, plaintiff "must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene."  Id.; see MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 64 (2d Cir. 2001) ("Without a finding that the domination occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met.").

45

Defendants now renew their motion for summary judgment on the alter ego theory of liability on the ground that there is no equitable basis for piercing the corporate veil.  In support of their motion, Defendants supplied the Court with 2005 financial information demonstrating the market capitalization and assets of EIIL.  (2005 Heck Decl., Exs. E, F).  Although awkwardly phrased, this "equitable basis" motion touches on both the domination and fraud or wrong prongs discussed above.

First, Defendants argue that UCIL/EIIL is and always has been an adequately capitalized corporation, negating any inference that UCIL was merely a dummy or shell corporation used to carry out UCC business.  See TNS Holdings, Inc. v. MKI Sec. Corp., 703 N.E.2d 749, 751 (N.Y. 1998) ("An inference of abuse does not arise . . . where a corporation was formed for legal purposes or is engaged in legitimate business.").  Plaintiffs respond that EIIL has lost approximately one-third of its value since 2005 and would be unable to pay class damages or implement equitable relief.  However, the Court reiterates that "EIIL's economic viability is not important for the purpose of looking into the future to see if EIIL can pay a specific dollar amount of damages.  EIIL's financial status is material to the extent it sheds light on EIIL's legitimacy as a corporation.  If, for example, EIIL were now defunct or had a negligible net worth, an inference of abuse would arise." Sahu II, 2006 WL 3377577, at

46

*8.  That is not the case here, and indeed it is uncontested that EIIL is an independent going concern of adequate capitalization and assets.

Taking a different tack, Plaintiffs argue that there is an issue of material fact with respect to veil-piercing because UCC controlled UCIL through the World Agricultural Products Team ("WAPT"), which encompassed UCC, Union Carbide Eastern, Union Carbide Agricultural Products, and UCIL.  In 1981, WAPT proposed the creation of a joint Bhopal Task Force - a study team comprised of UCC and UCIL employees - to develop a strategic plan for the Bhopal Plant, which was struggling financially. (Handley Decl., Ex. R at UCC05550; Ex. S at UCC05590).  The Bhopal Task Force extensively debated such business issues as manufacturing new products at the Bhopal Plant, export possibilities, and marketing strategies.  (Handley Decl., Ex. T at UCC05608; Ex. X at UCC05667-69).  One document notes that "any new strategies developed by [the Bhopal Task Force] will need approval by WAPT," and from this Plaintiffs infer that WAPT had veto power over all aspects of UCIL's business.  (Handley Decl., Ex. T at UCC05608).  However, the very next sentence informs UCIL's business manager that "you will have ample chance to review, revise, adapt, [and] suggest alternatives," (id.), discretion which is completely inconsistent with Plaintiffs' theory of absolute control.  Nor is it entirely logical that UCC

47

used WAPT to control all aspects of UCIL's business when UCIL itself participated in WAPT and the Bhopal Task Force.  Indeed, if UCC were in a position of plenary control, there would be no need to consult UCIL about its suggestions for the Bhopal strategic plan, or any other plans, at all.

Even if the Court accepts that UCC, through WAPT, approved the 1981 strategic plan for the Bhopal Plant, that fact does not compel piercing the corporate veil.  Legally, "[t]he mere assertion that a corporate parent is or was involved in the decision-making process of its subsidiary, or that it controlled the legitimate policies of its subsidiary, will not shift liabilities among distinct corporate entities."  Truglia v. KFC Corp., 692 F. Supp. 271, 275 (S.D.N.Y. 1998).  Moreover, there is no evidence to suggest that UCC's approval power extended beyond the strategic plan to other areas of UCIL's operations. A fresh review of the expanded summary judgment record only confirms the Court's previous finding that "nothing about the need for approval of a strategic plan indicates that UCC controlled every step UCIL took at Bhopal to implement that strategy."  Sahu v. Union Carbide Corp., 2010 WL 5158645 at *3. Moreover, the WAPT documents contain "no references whatsoever to pollution or environmental concerns. . . .  It is simply not reasonable to infer that the strategic planning documents' silence on the issue of UCC's participation in environmental

safety decision-making at Bhopal really indicates the parent's plenary control." Id. This record demonstrates nothing more than "active negotiations between a parent and subsidiary struggling to define a strategic plan for a Bhopal plant faced with problems such as high materials costs, Government-imposed licensing restrictions, and competition in the Indian pesticide market." Id. As the Fletcher Court found, "it is entirely appropriate for a parent corporation to approve major expenditures and policies involving the subsidiary, and for employees of the parent and subsidiary corporations to meet periodically to discuss business matters." 861 F. Supp. at 245. This is exactly the nature of UCC/WAPT and UCIL's interactions, and such conduct does not create a factual issue with respect to domination.[3]

Plaintiffs also argue that public statements made by Anderson in the aftermath of the 1984 gas leak disaster demonstrate UCC's control over the Bhopal Plant's design and operations. For example, in an interview published in the Hartford Courant, Anderson stated that the Bhopal Plant was "the same in terms of design criteria" as UCC's plant in Institute, West Virginia, but that it was "constructed in India, designed in India." (Handley Decl., Ex. GG at UCC06612). This

---

[3] This analysis applies with equal force to any argument that UCC's control of UCIL through WAPT is evidence of an agency relationship.

49

unremarkable, generic statement merely confirms that UCC sold design packages to UCIL for UCIL's use in designing and constructing the Bhopal Plant; it in no way implies UCC's micromanagement or control over design and operations in Bhopal. Furthermore, any public statements regarding the similarity of UCC and UCIL's safety standards must be understood in context as referring to the use of safety devices to prevent gas leaks, not waste disposal standards to prevent groundwater pollution. (Handley Decl., Ex. SS at 3). In any event, the similarity of workplace safety standards, equipment, or design is the natural result of UCIL's purchases through the 1974 Design Transfer Agreement, not evidence that UCC forced those similarities on its subsidiary. Anderson's public statements do not establish UCC's direct liability for the creation of a nuisance any more than they demonstrate disregard for the corporate form.

The Court notes that Plaintiffs have received thousands of pages of Rule 56(d) discovery on subjects including EIIL and its corporate relationship to UCIL and UCC, ownership or control of the Bhopal Plant, the relationship between UCC and UCIL as it relates to ownership or control of the Bhopal Plant, and the Bhopal Task Force. See Sahu v. Union Carbide Corp., 262 F.R.D. at 318; Sahu v. Union Carbide Corp., 418 F. Supp. 2d at 416. However, Plaintiffs have not alleged, much less introduced evidence in support of, any of the remaining Passalacqua

factors.  Instead, Plaintiffs' evidence establishes a lack of domination.  For example, the 1974 Design Transfer Agreement shows that UCIL purchased basic manufacturing process designs from its parent for a substantial sum of money.  (Handley Decl., Ex. LL at UCC12062).  Similarly, in 1973, UCIL contracted with its parent for the provision of certain technical services by UCC for a fee.  (Handley Decl., Ex. JJ at UCC12004-08, 12).  These agreements are the very definition of arms length dealings between corporate entities.

Although there is a marked lack of evidence of domination, Defendants' summary judgment motion focuses on the second veil-piercing element.  As discussed in connection with the direct liability, the expanded summary judgment record demonstrates that UCC played a minimal role, if any, with respect to the decision to back-integrate the Bhopal Plant, the design of the plant's waste disposal system, the choice and development of process technology used at the plant, and the burial of waste in a landfill.  There is no need to pierce the corporate veil to prevent fraud or injustice because, even if there were evidence that UCC dominated UCIL, there is no allegation or evidence that UCC did so to commit a fraud or wrong that harmed Plaintiffs.

### E.    Defendant Anderson

Under New York law, "a corporate officer who commits or participates in a tort, even if it is in the course of his

51

duties on behalf of the corporation, may be held individually liable." Lopresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997) (citation and internal quotation marks omitted). Plaintiffs contend that Anderson, as a member of UCC's Management Committee, participated in the decisions to back-integrate the Bhopal Plant and use unproven technology, and that he approved or ratified the proposed location for the plant site. (Compl. ¶¶ 73, 79-80). As discussed above, the back-integration project was proposed and executed by UCIL, and the only unproven technology utilized at Bhopal – that is, the CO and 1-naphthol processes – along with the Sevin batch carbamoylation process, were all developed by UCIL.

Plaintiffs also claim that UCC and Anderson approved the construction of the Bhopal Plant near residential neighborhoods whose drinking water could be contaminated. The only evidentiary support for this assertion is the Management Committee's endorsement of UCIL's 1973 Capital Budget Proposal. However, the Capital Budget Proposal merely describes the proposed plant location as "Bhopal, site of the formulation plant," a location that had "good rail communications, proximity to sources of raw materials, and low land cost." (2005 Heck Decl., Ex. D1 at UCC04204). Nothing therein suggests that the area was residential in 1973 or that UCC management knew it to be residential. Regardless of the condition of the

neighborhood, the documents suggest that the land for the plant site was allotted by the Government of Madhya Pradesh; thus the site of the Bhopal Plant was chosen for UCIL.  (Handley Decl., Ex. J at UCC04770 (requesting that Madhya Pradesh public health authorities grant an allotment of land for a manufacturing plant and noting that "it is absolutely essential that the area of the land, its location and various utilities available at the site must be known ahead" of time)).[4]  Moreover, as discussed above, approval of the Capital Budget Proposal does not rise to the level of participation in the commission of a tort.  Thus, there can be no individual liability for defendant Anderson.

### F.    Equitable Relief

Although the Court does not find any factual issue on any of the bases for liability against UCC and Anderson, it considers Defendants' objections to equitable relief in an abundance of caution.  In the complaint, "Plaintiffs and the Medical Monitoring Class" seek a "Court-ordered medical monitoring program for the early detection of various illnesses which they may develop as a result of exposure to the contaminants and pollutants to which they have been exposed as a consequence of Union Carbide's conduct," (Compl. ¶ 163), as well as "equitable and injunctive relief to remedy the contamination

---

[4] This analysis applies with equal force to any argument that UCC approved the site of the Bhopal Plant.

53

and spoliation of their properties, water supplies and overall habitable environment." (Compl. ¶ 173).

Plaintiffs were members of the purported class in the predecessor Bano case, in which the Court rejected medical monitoring as inequitable because

> medical monitoring is not a feasible remedy and one which would face insurmountable hurdles. Locating thousands of people who have resided 8,000 miles away in Bhopal, India, over a span of more than thirty years would be nigh impossible. Plaintiffs claim that the affected population can readily be identified as cancer and immune deficiencies are diseases capable of early detection through screening. The Court finds that the effort required to identify those citizens to be monitored would be limitless. This task would be extremely onerous on defendants, if not impossible.

Bano v. Union Carbide Corp., No. 99 Civ.11329, 2003 WL 1344884, at *9 (S.D.N.Y. Mar. 18, 2003), aff'd in part, 361 F.3d 696 (2d Cir. 2004). Relief in the form of remediation of the water supply in Bano was also denied as impracticable, a ruling the Second Circuit upheld on appeal. See Bano v. Union Carbide Corp., 198 F. App'x 32, 35 (2d Cir. 2006) ("As the district court observed, any clean-up of the aquifer or groundwater would affect the public generally and could not be undertaken without the permission and supervision of the Indian government. Yet, India has indicated (understandably) that it would control such a process; thus the same problems (lack of control and potential conflict with the Indian authorities) are inherent in any attempt to clean-up the aquifer and groundwater as were present

in the claims for remediation of the chemical plant site."
(internal citations omitted).

The facts in this case are remarkably similar to those in
Bano, thus the Court believes that the reasoning of Bano should
apply with equal force to the Sahu Plaintiffs.  With respect to
medical monitoring, the thirteen named Plaintiffs seek relief on
behalf of themselves, their families, their minor children, and
a putative class of similarly situated people who "continue to
reside in the municipal wards and residential areas in the
vicinity of the UCIL plant and continue to be exposed to toxins"
from contaminated soil and groundwater.  (Compl. ¶ 162).
Administration of such a program would require identification of
every resident considered to be living "in the vicinity" of the
Bhopal Plant site, and then further identification of those
residents who "continue to be exposed to toxins."  To confirm
exposure, it would be necessary to test the soil and drinking
water supply throughout Bhopal.  Literally construed,
Plaintiffs' complaint may seek medical monitoring for every
current resident of the Bhopal area – an impossible task.

With respect to remediation, as in Bano, the Court again
finds that remediation of the aquifer or groundwater supplies
requested by Plaintiffs "would affect the public generally and
could not be undertaken without the permission and supervision
of the Indian government."  198 F. App'x at 35.  Thus, UCC's

55

compliance with the proposed injunction "would be dependent on permission from an entity that is not a party to this lawsuit and that, therefore, cannot be subject to the district court's injunction." Bano, 361 F.3d 696, 717 (2d Cir. 2004). Moreover, the Court's inability to effectively supervise remediation of private property, water supplies, and the "overall habitable environment" in India weakens the injunctive power to such a degree that the requested relief is rendered impracticable.

### III.      Conclusion

Defendants' renewed motion for summary judgment is granted as to all of Plaintiffs' claims. The Clerk of Court is directed to close this case. On or before August 1, 2012, each side is directed to provide the Court with a status letter of no more than five pages regarding Sahu v. Union Carbide Corp., No. 07 Civ. 2156 (JFK), and the effect of this ruling, if any, on the companion Sahu case.

**SO ORDERED.**

Dated:    New York, New York
          June 26, 2012

                                        _____
                                           John F. Keenan
                                        United States District Judge